No. 24-60537

# In the United States Court of Appeals for the Fifth Circuit

VDX DISTRO, INCORPORATED; VAPETASTIC, L.L.C.,

PETITIONERS

*V.*

UNITED STATES FOOD & DRUG ADMINISTRATION;
MARTY MAKARY, COMMISSIONER, U.S. FOOD AND DRUG
ADMINISTRATION; UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, ROBERT F. KENNEDY, JR., SECRETARY,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

RESPONDENTS.

*ON PETITION FOR REVIEW OF A MARKETING DENIAL ORDER BY THE
UNITED STATES FOOD & DRUG ADMINISTRATION*

## PETITIONERS' BRIEF

J. GREGORY TROUTMAN*
TROUTMAN LAW OFFICE, PLLC.
4205 Springhurst Boulevard, Suite 201
Louisville, KY 40241
(502) 412-9179
*jgtatty@yahoo.com*
*Attorney for Petitioners*
*Attorney of Record.

**CERTIFICATE OF INTERESTED PERSONS**

**No. 24-60537; VDX Distro, Inc, *et al.* v. FDA, *et al.***

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. VDX Distro, Inc. (Petitioner)

2. Vapetastic, LLC (Petitioner)

3. J. Gregory Troutman (counsel for Petitioners)

4. Troutman Law Office, PLLC (counsel for Petitioners)

5. U.S. Food and Drug Administration (Respondent)

6. U.S. Department of Health and Human Services (Respondent)

7. Hon. Pamela Bondi (U.S. Attorney General)

8. United States Department of Justice (counsel for Respondents)

9. Robert F. Kennedy, Jr. (Respondent; HHS Secretary)

10. Samuel R. Bagenstos (HHS General Counsel)

11. Mark Raza (HHS Chief Counsel)

12. Dr. Martin Makary (Respondent; FDA Commissioner)

13. Dr. Bret Koplow (Acting Director, FDA Center for Tobacco Products)

14. Wendy S. Vicente (FDA Deputy Chief Counsel for Litigation)

15. Brian M. Boynton (Principal Deputy Assistant Attorney General)

16. Lindsey E. Powell (counsel for Respondents)

17. Joshua M. Koppel (counsel for Respondents)

Petitioner VDX Distro, Inc. does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

Petitioner Vapetastic, LLC does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

*/s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
*Attorney for Petitioners*

TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................ iv

JURISDICTIONAL STATEMENT ....................................................... xiv

STATEMENT CONCERNING ORAL ARGUMENT ........................... xv

GLOSSARY ..................................................................................... xvi

STATEMENT OF THE ISSUES ............................................................ 1

INTRODUCTION ............................................................................... 2

STATEMENT OF THE CASE ............................................................... 4

    I.    VDX AND VAPETASTIC ...................................................... 4

    II.   ENDS PRODUCT INDUSTRY SEGMENTATION. ...................... 6

    III.  TOBACCO CONTROL ACT AND THE DEEMING RULE ............ 8

    IV.   PMTA DEADLINES AND FDA ENFORCEMENT DISCRETION ... 10

    V.    FDA'S REPEATED MISINTERPRETATION OF THE APPH
          STANDARD .................................................................... 11

    VI.   FDA CONSISTENTLY VIEWED OPEN-SYSTEM PRODUCTS
          DIFFERENTLY BEFORE THE PMTA DEADLINE ...................... 14

    VII.  VDX'S PMTA .................................................................. 15

    VIII. FDA'S MDOS .................................................................. 16

STANDARD OF REVIEW .................................................................. 18

SUMMARY OF ARGUMENT ............................................................. 19

ARGUMENT .................................................................................22

I.  FDA'S POWER OVER ENDS PRODUCTS DERIVES FROM AN
    UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE
    AUTHORITY .........................................................................22

    A.  THE MAJOR QUESTIONS DOCTRINE .................................23

    B.  TOBACCO PRODUCTS AND THE MAJOR QUESTIONS
        DOCTRINE ......................................................................27

    C.  FDA'S PRIOR MAJOR QUESTIONS DOCTRINE HISTORY
        *VIS-A-VIS* TOBACCO PRODUCTS .........................................28

    D.  CONGRESS'S DELEGATION OF DEEMING AUTHORITY
        VIOLATED THE MAJOR QUESTIONS DOCTRINE ...............29

II.  THE APPH STANDARD IS UNCONSTITUTIONALLY VAGUE...34

    A.  PUBLIC HEALTH IS AN OPEN-ENDED AND AMBIGUOUS
        CONCEPT .........................................................................35

    B.  THE APPH STANDARD LACKS ASCERTAINABLE
        STANDARDS. ...................................................................39

    C.  FDA'S INTERPRETATION OF THE APPH STANDARD FAILS
        TO ACCOUNT FOR ADVERSE CONSEQUENCES ..................40

III.  FDA UNLAWFULLY INSTITUTED A *DE FACTO* BAN ON NON-
      TOBACCO FLAVORED PRODUCTS ...........................................44

    A.  FDA'S COMPARATIVE EFFICACY STANDARD IS A
        DISGUISED TOBACCO PRODUCT STANDARD ADOPTED
        CONTRARY TO THE TCA ..................................................45

    B.  *CHENERY II* COMMANDS FDA'S ADHERENCE TO THE
        TCA'S RULEMAKING REQUIREMENT ...............................47

C.  FDA CANNOT INVOKE *CHENERY II'S* EXCEPTIONS. ....... 49

    i.  *CHENERY II'S* SUFFICIENT EXPERIENCE EXCEPTION DOES NOT APPLY ...................................................... 49

    ii.  *CHENERY II'S* LACK OF REASONABLE FORESEEABILITY EXCEPTION DOES NOT APPLY ..... 50

    iii.  *CHENERY II'S* SPECIALIZED CIRCUMSTANCES EXCEPTION DOES NOT APPLY ................................... 51

IV.  FDA ARBITRARILY APPLIED THE APPH STANDARD .......... 52

A.  FDA ROOTED ITS APPH ANALYSIS UPON STALE YOUTH USE DATA AND REFUSED TO CHANGE COURSE AS DATA CHANGED. ........................................................................ 53

B.  FDA FAILED TO ADHERE TO THE TCA'S "POPULATION AS A WHOLE" METRIC. ........................................................ 58

C.  FDA ARBITRARILY APPLIED THE APPH STANDARD CONCERNING VDX'S MARKETING PLAN. ....................... 61

CONCLUSION ............................................................................. 70

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ............................. 71

CERTIFICATE OF SERVICE ....................................................... 71

<center>TABLE OF AUTHORITIES</center>

**CASES:**

*A. B. Small Co. v. American Sugar Refining Co.*,
267 U.S. 233 (1925)............................................................34

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021)......................................................26, 27

*Am. Academy of Pediatrics v. FDA*,
399 F. Supp.3d 479 (D. Md. 2019)......................................10

*Biden v. Nebraska*,
600 U.S. 477, 489 (2023)..............................................26, 27

*Bidi Vapor LLC v. FDA*,
47 F.4th 1191 (11th Cir. 2022)...................................*passim*

*Big Times Vapes, Inc. v. FDA*,
963 F.3d 436 (5th Cir. 2000)...............................................23

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
62 F.4th 905 (5th Cir. 2023)...............................................53

*Calcutt v. FDIC*,
598 U.S. 623 (2023)............................................................69

*Cigar Ass'n of Am. v. FDA*,
126 F.4th 699 (D.C. Cir. 2025).....................................21, 34

*Cuozzo Speed Techs, LLC v. Lee*,
579 U.S. 261 (2016)............................................................18

*Exxon Corp. v. Busbee*,
644 F.2d 1030 (5th Cir. 1981).............................................34

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)............................................................64

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...................................................*passim*

CASES—CONTINUED:

*FDA v. SWT Global,*
  604 U.S. ___, 145 S.Ct. 1919 (2025)...........................................3

*FDA v. Wages and White Lion Invs., LLC.,*
  406 U.S. ____, 145 S.Ct. 898 (2025)...............................*passim*

*Fontem US, LLC v. FDA,*
  82 F.4th 1207 (D.C. Cir. 2023)...........................................36

*General Land Off. of Texas v. Biden,*
  722 F.Supp.3d 700 (S.D. Tex. 2024)...........................................23

*Gonzalez v. Reno,*
  212 F.3d 1338 (11th Cir. 2000)...........................................48

*Gundy v. United States,*
  588 U.S. 128 (2019)...........................................39

*Jacobellis v. Ohio,*
  378 U.S. 184 (1964)...........................................35

*J.W. Hampton, Jr. & Co. v. U.S.,*
  276 U.S. 394 (1928)...........................................32

*Loper Bright Enterprises vs. Raimondo,*
  603 U.S. ___, 144 S.Ct. 2244 (2024)...............................*passim*

*Lopez-Munoz v. Barr,*
  941 F.3d 1013 (10th Cir. 2019)...........................................31

*Loving v. U.S.,*
  517 U.S. 748 (1996)...........................................23

*Marbury v. Madison,*
  5 U.S. 137 (1803)...........................................2

*Massachusetts Trustees of Eastern Gas & Fuel Associates v.*
*United States,*
  377 U. S. 235 (1964)...........................................22, 69

CASES—CONTINUED:

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................*passim*

*NFIB. v. OSHA*,
    595 U.S. 109 (2022)......................................................26, 27

*Nicopure Labs, LLC v. FDA*,
    266 F. Supp.3d 360 (D. D.C. 2017)...........................8, 30, 32

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019).............................................8

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935).............................................................30, 32

*R.J. Reynolds Vapor Co. v. FDA*,
    65 F.4th 182 (2023)...........................................................*passim*

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)..............................................................69

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)...........................................................*passim*

*Shinseki v. Sanders*,
    556 U.S. 396 (2009).............................................................69

*Sottera, Inc. v. FDA*,
    627 F.3d 891 (D.C. Cir. 2010)........................................29, 49

*Storio v. Borough of Point Pleasant Beach*,
    322 F.3d 293 (3rd Cir. 2003)..........................................24

*SWT Global Supply, Inc. v. FDA*,
    No. 21-60762, 2024 WL 3595387 (5th Cir. July 31, 2024) .................3

*U.S. v. L. Cohen Grocery Co.*,
    255 U.S. 81 (1921).............................................................39

CASES—CONTINUED:

*Util. Air Regulatory Group v. EPA,*
573 U.S. 302 (2014)……………………………………………...…27

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982)……………………………………..…………35

*Wages and White Lion Invs., LLC v. FDA,*
90 F.4th 357 (5th Cir. 2024)…………………………..……3, 33, 47

*Wayman v. Southhard,*
23 U.S. (10 Wheat) 1 (1825)……………………………..…25, 26

*West Virginia v. EPA,*
597 U.S. 697 (2022)……………………………..……25, 26, 27

*Whitman v. Am. Trucking Assn's,*
531 U.S. 457 (2001)……………………………..…………23

CONSTITUTION; STATUTES AND CONGRESSIONAL ACTS:

U.S. CONST., ART. I………………………………………23, 25

U.S. CONST. ART. III…………………………………………25

Administrative Procedure Act (APA), 5 U.S.C. §§ 500, *et seq*…..….*passim*
   § 553…………………………………………………………45
   § 705……………………………………..………………18
   § 706……………………………………18, 19, 69

Alcohol, Drug Abuse and Mental Health Administration Reorganization
   Act, PUB. L. 102-321………………………………….…….68

Consolidated Appropriations Act, 2022, PUB. L. 117-103, div. P.,
   tit. I, subtitle B, 136 STAT. 49………………………………31

Federal Food Drug and Cosmetic Act (FFDCA),
   21 U.S.C. § 301, *et seq.*……………………………28, 29, 35
   § 321(rr)………………………………….....8, 19, 29

CONSTITUTION; STATUTES AND CONGRESSIONAL ACTS—CONTINUED:

Family Smoking and Tobacco Control Act,
  21 U.S.C. §§ 387, *et seq*............................................................*passim*
  § 387(1).......................................................................45
  § 387(3).........................................................................8
  § 387(4).........................................................................8
  § 387(15).......................................................................8
  § 387(18).......................................................................8
  § 387a(b)...............................................................*passim*
  § 387f(d).......................................................................12
  § 387g...................................................................46, 49
  § 387g(a)...............................................................20
  § 387g(a)(1)..............................................................44
  § 387g(a)(4)(B)(1) ....................................................45
  § 387g(c)...........................................................44, 45
  § 387g(c)(1)................................................................45
  § 387g(c)(2)................................................................45
  § 387j.......................................................................*passim*
  § 387j(c).........................................................................1
  § 387j(c)(1)(A).......................................................1, 52
  § 387j(c)(1)(B)..............................................................13
  § 387j(c)(4)............................................................*passim*
  § 387j(c)(4)(A)..............................................................38
  § 387j(c)(5)(A)..............................................................37
  § 387k...........................................................................39
  § 387*l*(a)(1)(B)............................................................xiv
  § 387*l*(b)....................................................................18

H.R. 2248, 89th Congress (1966)...................................................28

155 CONG. REC. No. 50 at H3802 - H3805 (daily ed. Mar. 24, 2009)......31

155 CONG. REC. No. 82 at S6009 - S6012 (daily ed. Jun. 3, 2009)...........31

123 STAT. 1776 (Jun. 22, 2009).....................................................42

**REGULATIONS:**

61 FED. REG. 44,619 (Aug. 28, 1996)...............................................28

81 FED. REG. 28,974 (May 10, 2016)............................................9, 10

86 FED. REG. 55,300 (Oct. 5, 2021)........................................11, 12, 61

87 FED. REG. 26,454 (May 4, 2022)...........................................46, 51

Executive Order 14219, 90 FED. REG. 10583 (Feb. 19, 2025)...............32

**RULES:**

FED. R. APP. P. 15(c)...............................................................71

FED. R. APP. P. 32(a)(5).........................................................71

FED. R. APP. P. 32(a)(6).........................................................71

FED. R. APP. P. 32(a)(7).........................................................71

FED. R. APP. P. 32(f)..............................................................71

FED. R. APP. P. 34(a).............................................................xv

Fifth Circuit Rule 28.2.3.........................................................xv

**OTHER RESOURCES:**

Abrams, D., *et al.*, *Harm Minimization and Tobacco Control*, 39 ANNUAL REV. OF PUB. H. 193, 194 (2018)...................................9

*Arrazola, R., et. al.*, Tobacco Use Among Middle and High School Students — United States, 2011–2014, MMWR MORB. MORTAL WKLY. Rep. 2015:64(14);381-385 (Apr. 17, 2015)..................................43

Birdsey, J., *et al. Tobacco Product Use Among U.S. Middle and High School Students — National Youth Tobacco Survey, 2023*, MMWR Morb. Mortal Wkly. Rep. 2023;72:1173–1182................................7

Black's Law Dictionary, *Health* (12th ed. 2024)...............................36

**OTHER RESOURCES—CONTINUED:**

*Cooper, M, et. al.*, *Notes from the field: E-cigarette use among middle and high school students-United States, 2022*. MMWR MORB, MORTAL WKLY, REP. 2022;71(40):1283- 1285 (Oct. 7, 2022).........................54

Encyclopaedia Britannica, *Public Health*...........................................36

Fadus, M., *The Rise of E-Cigarettes, Pod Mod Devices, and JUUL Among Youth: Factors Influencing Use, Health Implications, and Downstream Effects*, *Drug Alcohol Depend.*, 201:85-93 (Aug. 1, 2019).................49

FDA, *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 79 FED. REG. 23,142, *et. seq.* (Apr. 25, 2014)....................50

FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)*, Jan. 2020 (Rev. Apr. 2020)..........................................................................*passim*

FDA, *Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule; Guidance for Industry; Availability*, 82 FED. REG. 37,459 (Aug. 10, 2017).........................10

FDA, *CPB, FDA Seize Counterfeit, Unauthorized E-Cigarettes, FDA News Release*, Jan. 13, 2021.............................................................60

FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (Jun. 21, 2024)….....…....48

FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (Revised): Guidance for Industry* (Jun. 2019, Rev. Mar. 2023)...............................................................................18

FDA, *Premarket Tobacco Product Applications and Recordkeeping Requirements* (Oct. 5, 2021)…………………………….....………*passim*

OTHER RESOURCES—CONTINUED:

FDA, *Statement from FDA Commissioner Scott Gottlieb, M.D., on New Steps to Address Epidemic of Youth E-cigarette Use*, (Sept. 11, 2018)............................................................…...……57

FDA, *Tobacco Product Standard for Menthol in Cigarettes* (May 4, 2022)......................................................…..……………..38, 43

Federalist No. 10, at 82-84 (J. Madison)………………………………

Federalist No. 51 (C. Rossiter ed. 1961 (Madison)…………………………22

Friedman, A*., E-cigarette Flavor Restrictions' Effects on Tobacco Product Sales* (Jan. 29, 2024)...................................…......….……3

Friedman A., et. al., Flavored E-Cigarette Sales Restrictions and Young Adult Tobacco Use, JAMA HEALTH FORUM, 2024:5(12) (Dec. 27, 2024)...............................................................……43

Gades, Mari S., BA, *The Role of Nicotine and Flavor in the Abuse Potential and Appeal of Electronic Cigarettes for Adult Current and Former Cigarette and Electronic Cigarette Users: A Systematic Review*, NICOTINE AND TOBACCO RESEARCH 2022:1332-1343…………2

Gellhorn & P. Verkuil, *Controlling Chevron-Based Delegations*, 20 CARDOZO L. REV. 989, 1011 (1999)……………………….…………25

Gentzke, A., *Tobacco Product Use and Associated Factors Among Middle and High School Students* — National Youth Tobacco Survey, United States, 2021. MMWR SURVEILL. SUMM. 2022;71(No. SS-5):1–29……………………………………………..……………………38

Gottlieb, S. *et. al., A Nicotine-Focused Framework for Public Health*, THE NEW ENGLAND J. OF MED., 377:12 (Sept. 21, 2017)………………....…9

*Jamal, A, et. al.*, Current Cigarette Smoking Among Adults — United States, 2005–2014, MMWR MORB. MORTAL WKLY. Rep. 2015:64(44);1233-1240 (Nov. 13, 2015)…………………………....…42, 43

*Jamal A, et al*., Tobacco Product Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2024. MMWR MORB. MORTAL WKLY. REP. 2024;73:917–924 (Oct. 17, 2024)……………………………………………………...…….…...7, 8

**OTHER RESOURCES—CONTINUED:**

*Jones, J.*, Cigarette Smoking Rate in U.S. Ties 80-Year Low, Gallup (Aug. 13, 2024)...............................................................................42

Kim, S., *et al., Persistence of Youth Use of Electronic Nicotine Delivery Systems in the Population Assessment of Tobacco and Health, 2017-2021.* SUBSTANCE USE & MISUSE, 1–7 (Jun. 30, 2025)....................57

King, B., *et. al., Commentary on Wackowski et al.: Opportunities and Considerations for Addressing Misperceptions About the Relative Risks of Tobacco Products among Adult Smokers*, 118 ADDICTION 1892 (2023)..................................................................................9

Klebe, E.R., *Actions of the Congress and the Federal Government on Smoking and Health*, Congressional Research Serv., Report No. 79-219 (Sept. 26, 1979)................................................................24

Matsakis, L., *The US Is Being Flooded by Chinese Vapes*, Wired, Jun. 25, 2024 Jun. 25, 2024.................................................................41

Miron, J*., Alcohol Consumption during Prohibition*, 81 AM. ECON. Rev. 242 (1991)............................................................................41

Merriam-Webster Dictionary, *Public Health*..................................36

Park-Lee, E., *Notes from the Field:* E-Cigarette Use Among Middle and High School Students - National Youth Tobacco Survey, United States, 2021. MMWR MORB. MORTAL WKLY. Rep. 2021;70:1387-1389...............................................................................60

Park-Lee, E., *Notes from the Field:* E-*Cigarette and Nicotine Pouch Use Among Middle and High School Students* — United States, 2024. MMWR MORB. MORTAL WKLY. Rep. 2024;73:774–778......................3

OMB Mark-Up-FDA-2014-N-0189-83193, Docket No. 2014-850..........46

Smith MJ, *et al., Youth's engagement and perceptions of disposable e-cigarettes: a UK focus group study*, BRITISH MED. J. OPEN, 2023;13:e068466......................................................................8

**OTHER RESOURCES—CONTINUED:**

The White House, *Fact Sheet: President Donald J. Trump Directs Repeal of Regulations That Are Unlawful Under 10 Recent Supreme Court Decisions* (Apr. 9, 2025)..............................................................33

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 108 (5th Ed. 1883)...............................................................24

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under Section 912 of the Family Smoking Prevention and Tobacco Control Act (TCA), 21 U.S.C. § 387, *et seq*., codified as 21 U.S.C. §387*l*(a)(1)(B), to review the U.S. Food and Drug Administration's (FDA) marketing denial order (MDO) issued to Petitioner, VDX Distro, Inc. (VDX) on September 19, 2024. The MDO denied marketing authorization which VDX sought in the Pre-Market Tobacco Product Applications (PMTA) filed pursuant Section 910 of the TCA, codified as 21 U.S.C. §387j, for its flavored electronic nicotine delivery system (ENDS) products (*i.e.* electronic cigarettes). The MDO fully and finally decided VDX's PMTA at the administrative level. *See* 21 U.S.C. §§387j, 387*l*(a)(1)(B).

VDX and Vapetastic filed a timely Petition for Review with this Court on October 12, 2024 within the 30-day deadline set forth in 21 U.S.C. §387*l*(a)(1)(B). *See* ECF #1. Venue is proper in this circuit under 21 U.S.C. §387*l*(a)(1)(B) as Vapetastic is headquartered in New Braunfels, Texas, 78130 and is a "person adversely affected" by the MDO as contemplated by said statute. *See FDA v. R.J. Reynolds Vapor Co.*, 605 U.S. ___, 145 S.Ct. 1984 (2025).

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to FED. R. APP. P. 34(a) and Fifth Circuit Rule 28.2.3, VDX and Vapetastic request an oral argument.

This appeal raises important legal questions regarding the constitutionality of two key parts of the TCA (its "deeming" provision set forth in 21 U.S.C. § 387a(b) and its review standard set forth in 21 U.S.C § 387j) and FDA's failure to comply with the Administrative Procedure Act (APA), 5 U.S.C., §§ 500, *et. seq.*, concerning its review of VDX's PMTA. The constitutional questions are novel issues before this Court. Oral argument would thus assist the Court in resolution of this appeal.

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| APPH | Appropriate for the Protection of the Public Health |
| ENDS | Electronic Nicotine Delivery Systems |
| FDA | Food and Drug Administration |
| MDO | Marketing Denial Order |
| PMTA | Pre-Marketing Tobacco Product Application |
| TCA | Family Smoking Prevention and Tobacco Control Act |

## STATEMENT OF THE ISSUES

In September 2020, VDX timely filed an extensive PMTA with FDA pursuant to the TCA for multiple menthol-flavored and menthol-tobacco flavored ENDS products under the "Four Seasons" brand.

FDA conducted a "targeted review"[1] of VDX's PMTA, not the full scientific review required by 21 U.S.C. § 387j(c). FDA issued an MDO because the PMTA did not contain a specific type of study which showed that VDX's non-tobacco flavored products were more effective than its tobacco flavored products in causing smoking cessation.[2] FDA mandated this study to satisfy its interpretation of the TCA's nebulous "appropriate for the protection of the public health" (APPH) standard.

This case raises the following issues:

1.    Does the TCA's "deeming" provision, 21 U.S.C. § 387a(b), violate the Major Questions Doctrine and the Supreme Court's holding in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)?

2.    Is the APPH standard, 21 U.S.C. § 387j, unconstitutionally vague and ambiguous?

---

[1] APPX. 129-130 (ADMIN. REC. 000184-000185).

[2] FDA also failed to adjudicate VDX's PMTA within the 180-day period provided in 21 U.S.C. § 387j(c)(1)(A).

3.    Did FDA violate 21 U.S.C. § 387g(c) by adopting a *de facto* ban on non-tobacco flavored ENDS products through *ad hoc* PMTA adjudications in lieu of the TCA's mandatory rulemaking process?

4.    Did FDA arbitrarily ignore the APPH standard's "population as a whole" concept when conducting its PMTA review?

5.    Did FDA act arbitrarily by disregarding the elements of VDX's marketing plan and was such error was harmless?

## INTRODUCTION

VDX filed its PMTA in September 2020 and FDA issued its MDO in September 2024. 21 U.S.C. § 387j bases marketing decisions upon an APPH analysis. The scientific landscape underlying the benefits and risks implicated in the APPH analysis changed significantly between the time VDX filed its PMTA and FDA adjudicated it. Scientists also better clarified that flavored ENDS products are highly effective in converting adult smokers,[3] and youth usage (FDA's prime justification for its *de facto* flavor ban) plummeted more than 70%.[4] Finally, a comprehensive, multi-

---

[3] *See e.g.,* Gades, Mari S., BA, *et al.*, *The Role of Nicotine and Flavor in the Abuse Potential and Appeal of Electronic Cigarettes for Adult Current and Former Cigarette and Electronic Cigarette Users: A Systematic Review*, NICOTINE AND TOBACCO RESEARCH 2022:1332-1343, at 1332, 1339.

[4] Park-Lee, E., *et al. Notes from the Field:* E-*Cigarette and Nicotine Pouch*

disciplinary study revealed that banning flavored ENDS products leads to increased sales of youth-preferred cigarette brands.[5]

The legal landscape also changed significantly. From a micro perspective, this Court has uniformly rejected FDA's imposition of its comparative efficacy standard to flavored ENDS products. *See* e.g., *Wages and White Lion Invs., LLC v. FDA*, 90 F.4th 357 (5th Cir. 2024);[6] *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (2023); and *SWT Global Supply, Inc. v. FDA*, No. 21-60762 (5th Cir. Jul. 31, 2024).[7] Notwithstanding the Supreme Court's recent opinion in *Wages* which negated this Court's "fair notice" holding, the constitutionality of the TCA's "deeming" provision and the legality of FDA's comparative efficacy standard are still ripe for adjudication. *See* 145 S.Ct. at 915-16.

---

*Use Among Middle and High School Students* — United States, 2024. MMWR MORB. MORTAL WKLY. Rep. 2024;73:774–778 (2.24% regular usage of which open-system products account for only 6.7% of all youth usage).

[5] Friedman, A., *et al., E-cigarette Flavor Restrictions' Effects on Tobacco Product Sales* (Jan. 29, 2024). http://dx.doi.org/10.2139/ssrn.4586701

[6] While the Supreme Court vacated this Court's decision in *Wages*, it nevertheless confirmed that the issues raised herein are justiciable. *See FDA v. Wages and White Lion Invs, LLC*, 604 U.S. ___, 145 S.Ct. 898, 916, n. 3 (2025).

[7] The Supreme Court vacated *SWT Global* for the same reason as *Wages*. *FDA v. SWT Global*, 604 U.S. ___, 145 S.Ct. 1919 (2025).

From a macro perspective, the Supreme Court's ruling in *Loper Bright Enterprises vs. Raimondo*, 603 U.S. 369 (2024) significantly upended the legal standard for reviewing agency interpretations of ambiguous statutory standards. Courts now must exercise "independent judgment," and consider the "thoroughness" of the agency's reasoning. *Id.* at 393, 432. These principles are critical here because FDA will be asking that the Court defer to its APPH determination *vis-à-vis* flavored ENDS products—a determination based upon stale and irrelevant data and myopically refused to adjust its view accordingly. FDA has thus evidenced anything but a thorough and independent judgment *vis-à-vis* flavored open-system ENDS products in applying the APPH standard.

## STATEMENT OF THE CASE

### I.  VDX AND VAPETASTIC

VDX was incorporated in Nevada in November 2017 and has its principal office in metro Los Angeles.[8] VDX is the direct successor to Vapor Delux, Inc. (Vapor Delux), incorporated in May 2013 in California.[9] In 2013, Vapor Delux developed a line of its own branded menthol-

---

[8] ECF #11 at A103.

[9] *Ibid.*

flavored and menthol-tobacco- flavored ENDS products for use in open-system vaping products.[10] Vapor Delux rebranded its products to the name "Four Seasons."[11] It specifically designed Four Seasons' adult-oriented trade dress which does not rely upon things like cartoons, bright colors, images or messages which youth might find appealing.[12]

VDX's Four Seasons e-liquid products contain propylene glycol, vegetable glycerin, food-grade flavorings; and some products also contain freebase or salt nicotine derived from tobacco.[13] The products come in two different variations: (a) 30mg/ml and 50mg/ml salt nicotine concentrations in 30 ml bottles and (b) 3mg/ml, 6mg/ml, 12mg/ml, and 18mg/ml freebase nicotine concentrations in either 30ml or 60ml bottles.[14] VDX also offers nicotine-free menthol and tobacco menthol products in 30ml and 60ml bottles.[15] Four Seasons products are sold

---

[10] *Ibid.*, at A104.

[11] *See* ECF # 11 at A114–A122; A130–132 (digital images depicting the trade dress—the branding and labeling—of the Four Seasons products here at issue).

[12] *Id.*, at A114–A122.

[13] *Id.*, at A104–A105.

[14] *Ibid.*

[15] *Ibid.*, at A105.

exclusively in specialty retail stores (*i.e.* vape shops) or online open-system retail portals which enforce age-identification policies.[16] It is thus not surprising that no Four Seasons products have ever been the subject of an underage sale violation found by any governmental authority.[17] Vapetastic, LLC is a Texas vaping products specialty retailer, and an example of the type of specialty stores which VDX has sold, and currently sells, its Four Seasons menthol and menthol tobacco products.[18]

## II.   ENDS PRODUCT INDUSTRY SEGMENTATION.

The ENDS product industry has segregated itself into the "open-system" and "closed-system" segments. Open-system products are generally manufactured by small, privately-owned companies, like VDX, who had no prior history in the tobacco business. Many open-system industry stakeholders are former smokers who were among the first to use vaping products to quit smoking. Closed-system pod products are generally manufactured and distributed by legacy tobacco companies while disposable products largely come from China.

---

[16] *Ibid.,* at A107.

[17] *Id.*, at A107.

[18] *Ibid.*

Open-system and closed-system products are also generally sold in different retail channels (general retailers versus specialty stores). The products also have different physical characteristics. Open-system devices are generally larger, relying on: (1) higher-powered, rechargeable lithium batteries which are either replaceable or self-contained within the device; (2) computer circuitry which allows the independent regulation of the device's thermal and wattage parameters; and (3) interchangeable and refillable e-liquid tanks (referred to as atomizers) as key elements. These elements allow consumers significant freedom to customize their devices. Closed-system products have: (1) a small device size and (2) either a disposable pre-filled cartridge or pod which offers e-liquids in a limited variety of flavor choices.

The small device size of closed-system products and their ease of both use and access from non- age-restricted stores led to youths overwhelmingly preferring them. This is evidenced by the 2023 and 2024 National Youth Tobacco Survey (NYTS).[19/20] This disproportionate

---

[19] Birdsey, J., *et al. Tobacco Product Use Among U.S. Middle and High School Students — National Youth Tobacco Survey, 2023*, MMWR Morb. Mortal Wkly. Rep. 2023;72:1173–1182 at Table 3.

[20] Jamal, A., *et al.*, *Tobacco Product Use Among Middle and High School*

preference is particularly true of the "disposable" or "single use" products.[21]

## III. TOBACCO CONTROL ACT AND THE DEEMING RULE

Congress defined the term "tobacco product," 21 U.S.C. § 321(rr), and only gave FDA immediate authority over four tobacco product subsets (cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco),[22] 21 U.S.C. § 387a(b). Congress left the decision about whether, when, and how to regulate all other tobacco products to FDA's unfettered whim by delegating it legislative authority to "deem" any additional tobacco products to regulation. *Id.* Congress, however, failed to articulate any guidance which cabined FDA's deeming authority. *See Nicopure Labs, LLC v. FDA*, 266 F. Supp.3d 360, 392-93 (D.D.C. 2017), *aff'd* 944 F.3d 267 (D.C. Cir. 2019) (Congress "did not provide standards for when and how to exercise its discretion to deem").

---

*Students — National Youth Tobacco Survey, United States, 2024*, MMWR Morb. Mortal Wkly. Rep. 2024;73:917–924.

[21] Smith MJ, *et al., Youth's engagement and perceptions of disposable e-cigarettes: a UK focus group study*, BRITISH MED. J. OPEN, 2023;13:e068466. doi:10.1136/bmjopen-2022-068466.

[22] Defined respectively in 21 U.S.C. §§ 387(3), (4), (15) and (18).

In May 2016, FDA invoked regulatory authority through its "Deeming Rule," 81 Fed. Reg. 28,974 (May 10, 2016). This immediately subjected all other tobacco products to the TCA's time-consuming and costly PMTA requirement. FDA, however, expresses that "tobacco products exist on a continuum of risk,"[23] and ENDS products fall on the lower end. FDA's expression[24] is represented by Table 1 below:"[25]



**Table 1**

[23] King, B., *et. al.*, *Commentary on Wackowski et al.: Opportunities and Considerations for Addressing Misperceptions About the Relative Risks of Tobacco Products among Adult Smokers*, 118 Addiction 1892 (2023).

[24] Gottlieb, S. *et. al., A Nicotine-Focused Framework for Public Health*, The New England J. of Med., 377:12 (Sept. 21, 2017).

[25] Abrams, D., *et al.*, *Harm Minimization and Tobacco Control*, 39 Annual Rev. of Pub. H. 193, 194 (2018).

## IV.   PMTA DEADLINES AND FDA ENFORCEMENT DISCRETION

The Deeming Rule would have immediately cleared the market of all existing ENDS products but for FDA deferring enforcement while it reviewed timely-filed PMTAs. *See* 81 FED. REG. at 28,978. The Deeming Rule originally set an August 8, 2018 PMTA deadline. *Id.*, at 28,977. FDA issued a guidance document in August 2017 which extended the deadline to August 8, 2022 as part of a larger policy initiative after a change of presidential administrations.[26]

A legal challenge to FDA's deadline extension resulted in a Maryland federal court unilaterally setting a September 9, 2020 deadline and giving FDA a year to review timely PMTAs. *See Am. Academy of Pediatrics v. FDA*, 399 F. Supp.3d 479 (D. Md. 2019). The Court further determined that products subject to a timely PMTA could remain on the market during the review period, after which time they would be subject to FDA's enforcement discretion. *Id.*

---

[26] FDA, *Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule; Guidance for Industry; Availability*, 82 FED. REG. 37,459 (Aug. 10, 2017).

## V.  FDA'S REPEATED MISINTERPRETATION OF THE APPH STANDARD

The TCA requires that FDA conduct a complex, science-based evaluation of a PMTA's entire contents to determine whether a product is APPH. FDA must consider:

> "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account – (A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products."

21 U.S.C. §387j(c)(4). FDA's final PMTA rule (issued 14 months after the PMTA deadline) did not place emphasis on any single factor but instead acknowledged the analysis involves a:

- "complex determination;"[27]

- "requires a balancing" of risks and benefits;[28]

- is not made "on one static set of requirements;"[29] and

---

[27] FDA, *Premarket Tobacco Product Applications and Recordkeeping Requirements*, 86 FED. REG. 55,300, 55,335 (Oct. 5, 2021). As argued *infra.*, APPH involves an almost infinite number of factors given the broad meaning of "public health".

[28] 86 FED. REG. at 55,384.

[29] *Ibid.* at 55,385.

- requires "individualized" reviews, of "all of the [PMTAs] contents."[30]

FDA had not "create[d] a series of criteria" that products had to satisfy at the time it reviewed VDX's PMTA.[31]

A key element of the APPH calculus is the way manufacturers restrict the sale and distribution of their products, particularly focused on preventing of youth access. 21 U.S.C. §387j(c)(1)(B) (focusing on sale and distribution restrictions, including underage "access" and "advertising and promotion"). *See also* 21 U.S.C. §387f(d). FDA's proposed PMTA rule told manufacturers that their marketing plans were "critical" to an APPH finding.[32] FDA's final PMTA guidance also promised to "weigh" marketing and access restrictions that would decrease the likelihood of youth use in reaching an APPH decision.[33]

FDA's January 2020 enforcement guidance (updated in April 2020) went a step farther—recommending "adequate measures" which ENDS

---

[30] *Ibid.* at 55,320, 55,390.

[31] *Ibid.* at 55,386.

[32] 86 FED. REG. at 55,323.

[33] *See FDA, Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (Revised): Guidance for Industry* (Jun. 2019, Rev. Mar. 2023) at 13, 27. https://www.fda.gov/media/127853/download

manufacturers could take to guard against youth access. These
recommendations included:

- limiting its retail sales channels to adult-only retail establishments and online retail portals with adequate online age verification software which rely upon independent, third-party public records databases;

- properly educating and supporting its distributors, wholesalers, and retailers to ensure that they have appropriate systems in place for age verification for in-person and online sales;

- complying with local, state, and federal age restrictions for the sale of vapor products.[34]

VDX included each of these elements in its PMTA marketing plan,[35] and
further evidenced its commitment to curbing underage use by providing
age-verification warning stickers to its retail customers for display in
their establishments.[36]

---

[34] FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)*, 22 Jan. 2020 (Rev. Apr. 2020.

[35] *See* ECF #11 at A124-A127.

[36] *Ibid.*, at A134.

## VI. FDA Consistently Viewed Open-System Products Differently Before the PMTA Deadline

FDA consistently emphasized a relaxed regulatory attitude about menthol-flavored open-system ENDS products prior to the PMTA deadline. That attitude made sense given FDA's acknowledgement that they pose far less risks to youths. FDA's January 2020 enforcement guidance, for instance, acknowledged that youth use was primarily confined to flavored "cartridge-based ENDS products" and that was to be its regulatory focus.[37] FDA's pre-PMTA position evidenced an attempt to:

> "strike[] an appropriate balance between restricting youth access to [flavored, cartridge-based products], while maintaining availability of potentially less harmful options for current and former adult smokers who have transitioned or wish to transition completely away from combusted cigarettes."[38]

In fact, FDA intimated that this policy should have "minimal impact" on small open-system ENDS product manufacturers like VDX unless they marketed to youths or failed to implement the aforementioned "adequate measures."[39]

---

[37] APPX. 168, 175, 183 (ADM. REC. 2809, 2816, 2824).

[38] APPX. 185 (ADMIN. REC. 2826).

[39] Appx. 181, 183 (ADMIN. REC. 2822, 2824) (explaining why open-system products are less attractive to youth).

## VII.    VDX's PMTA

VDX filed its PMTA on September 9, 2020 covering menthol flavored products from its "Four Seasons" brand.[40]  VDX hired a professional health consultant which spent approximately a month preparing its PMTA, totaling 300 megabytes of data.[41]  VDX's PMTA included a marketing plan which detailed its commitment to ensuring youths neither access nor purchase its products, including the "adequate measures" which FDA recommended.[42]  VDX's PMTA also evidenced its commitment to maintain a more sophistic adult orientation (consumers at least 35 years of age) by utilizing clean and adult-focused branding for its Four Seasons menthol and menthol tobacco products.[43]

---

[40] *See* ECF # 11, at A107. *See also* APPX. 54 (ADMIN. REC. 64) (acknowledging the date of VDX's PMTA).

[41] ECF #11, at A107–108.

[42] *Ibid.*, at A107–110.

[43] *Ibid*, at A104, A111.

## VIII. FDA's MDOs

On September 19, 2024, FDA issued the MDO to VDX.[44] FDA found

VDX's products were not APPH because its PMTA:

> "lack[ed] sufficient evidence demonstrating that
> your flavored ENDS will provide a benefit to adult
> users that would be adequate to outweigh the risks
> to youth."[45]

Specifically, FDA found VDX's PMTA did not contain a comparative

efficacy study – a single, highly-specific study designed to elicit one

datapoint – *i.e.*, a randomized controlled and/or longitudinal cohort study

or other study that compared the cessation benefits over time of VDX's

menthol products.[46]  FDA also claimed that VDX's marketing and other

restrictions would not sufficiently reduce the risks to youth from flavored

vaping products,[47] while ignoring whether the real-time application of

those restrictions had netted effective results.

The MDO's Technical Project Lead (TPL) made several key points.

*First*, a product must generate a "net benefit" to public health based on

---

[44] APPX. 46-53 (ADMIN. REC. 46–53).

[45] APPX. 151 (ADMIN. REC. 206).

[46] APPX. 27, 130 (ADMIN. REC. 47, 185).

[47] APPX. 129-130 (ADMIN. REC. 184–185).

the "risks and benefits to the population as a whole,"[48] citing 21 U.S.C.
§387j(c)(4). FDA acknowledges its analysis is not limited to just youth
risks and adult cessation but encompasses all other product information
(*e.g.*, chemistry, toxicology, reductions in premature mortality, increases
in life-years lived, etc.).[49] *Second*, FDA represented:

> "[a]s the known risks of the product increase or
> decrease, the burden of demonstrating a substantial
> enough benefit likewise increases or decreases."[50]

This representation is critical because youth use had plummeted
substantially by the time FDA reviewed VDX's PMTA. Yet, FDA failed to
lower the evidentiary bar concerning such risk and has refused to budge
even as youth usage has continued in freefall.

Despite its prior commitment to conduct a full evidentiary review,
FDA only conducted a "targeted review" of VDX's PMTA, determining
that a full scientific review was "unnecessary."[51] FDA based its targeted
review upon: (1) the lack of a comparative efficacy study;[52] (2) VDX's

---

[48] APPX. 127 (ADMIN. REC. 182).

[49] APPX. 129 (ADMIN. REC. 184).

[50] APPX. 128 (ADMIN. REC. 183).

[51] APPX. 129, 143 (ADMIN. REC. 184, 198).

[52] APPX. 130 (ADMIN. REC. 185).

marketing plan did included "novel" measures (*i.e.* "device access restrictions");[53] and (3) the same criticisms lodged in the MDO's discussion of a "cross-sectional survey."[54] FDA thus concluded by default that, even without reviewing the entire PMTA, it would be impossible for VDX to overcome the above shortcomings and show a net benefit, denying the PMTA for sake of efficiency.[55]

## STANDARD OF REVIEW

This Court applies the APA when reviewing a challenge to an MDO, 21 U.S.C. 387*l*(b); 5 U.S.C. §§705- 706. The APA directs this Court to "interpret constitutional and statutory provisions" to determine if an agency action is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §706(2). This statutory rubric also includes constitutional challenges to an agency action or regulatory scheme. *See Cuozzo Speed Techs, LLC v. Lee*, 579 U.S. 261 (2016).

---

[53] APPX. 146 (ADMIN. REC. 201).

[54] APPX. 148 (ADMIN. REC. 203).

[55] APPX. 130 (ADMIN. REC. 185).

VDX's and Vapetastic's challenge to the lawfulness of the MDO requires the Court to determine whether the MDO is: (i) contrary to a constitutional power; (ii) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (iii) without observance of procedure required by law. 5 U.S.C. §§706(2).

## SUMMARY OF ARGUMENT

*First*, the TCA's deeming provision, 21 U.S.C. § 387a(b), and the concurrent Deeming Rule, represent an unconstitutional delegation of legislative authority. *Brown & Williamson, supra.,* held the regulation of tobacco products was a "major question" and FDA lacked regulatory authority absent enabling legislation. Congress thus had to define the scope of what constituted "tobacco" and which products would be placed under FDA's regulatory control.

Congress predicated the TCA upon the broad "tobacco product" definition. 21 U.S.C. § 321(rr). It then granted FDA authority over four product subsets. *Ibid.* at § 387a(b). Congress then vested FDA with unfettered legislative authority to determine which additional tobacco products it would regulate. *Ibid.* This was inconsistent with *Brown & Williamson's* major question holding, and the Court should strike down

both the 21 U.S.C. § 387a(b) deeming provision and FDA's Deeming Rule as violating the Major Questions Doctrine.

*Second*, the TCA's APPH standard, 21 U.S.C. § 387j, is unconstitutionally vague. The concept of "public health" is broad considering the "population as a whole." The TCA fails to define key terms or sufficiently guide FDA in weighing the virtually infinite, divergent, and often competing, public health considerations given our vast population diversity. FDA has also failed to account for the possible adverse consequences of its *de facto* ban on flavored ENDS products (*i.e.*, increased youth smoking). This was the regulatory equivalent of cutting off your nose to spite your face.

*Third*, FDA ignored Congress's clearly mandated process for adopting tobacco product standards by implementing a *de facto* ban on non-tobacco flavored ENDS products. The TCA prescribes an APA-style rulemaking process for adopting a product standard which regulated ingredients and constituents. *See* 21 U.S.C. § 387g(a). Instead, FDA imposed a *de facto* product standard through *ad hoc* PMTA adjudications, relying upon *SEC v. Chenery Corp. (Chenery II)*, 332 U.S. 194 (1947). *Chenery II,* however, requires FDA's adherence to the TCA's notice-and-comment rulemaking

process, and its narrow "specialized problem" exception does not apply given FDA's vast history with flavored ENDS products.[56]

*Fourth*, FDA arbitrarily ignored the APPH standard when adjudicating VDX's PMTA. This question is well-suited for *Loper* analysis because FDA arbitrarily rooted its interpretation of the ambiguous APPH standard upon stale data and ignored the TCA's mandate to consider all relevant factors *vis-à-vis* the population as a whole.

FDA based its MDO upon a presumption about youth risks rooted in stale and manipulated statistics which selectively focused on distinct aspects of two particular "subpopulations" instead of considering the weight of the TCA's factors across the entire population. Further, FDA erroneously and arbitrarily presumed that all flavored ENDS products are equally attractive to youths irrespective of product type. FDA thus ignored a prior representation that open-system ENDS products pose less risk. FDA's calculus is similar to its presumption about premium cigars recently struck down in *Cigar Ass'n of Am. v. FDA*, 126 F.4th 699 (D.C. Cir. 2025).

---

[56] In *Wages,* the Supreme Court tangentially addressed in *dicta* that *Chenery II* requires agency compliance with a statutorily-mandated rulemaking process in lieu of proceeding through *ad hoc* adjudications. 145 S.Ct. at 915-16.

Finally, FDA violated the APA by arbitrarily failing to consider the elements of VDX's marketing plan. FDA's failure to consider the VDX marketing plan was not harmless error based upon the standard set forth in *Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States*, 377 U. S. 235, 248 (1964) (an agency decision is harmless when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached) which the Supreme Court countenanced in *Wages*. FDA's failure to review VDX's marketing plan was arbitrary because the elements of that plan are outcome-determinative given that current data would afford more weight thereto in an APPH analysis.

## ARGUMENT

### I. FDA'S POWER OVER ENDS PRODUCTS DERIVES FROM AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY.

As a threshold matter, the Court should grant review and vacate the MDO because FDA's authority over open-system ENDS products derives from an unconstitutional delegation of legislative power. The Supreme Court's Major Questions Doctrine holding in *Brown & Williamson* and its progeny mandates a determination that Congress impermissibly

delegated legislative authority to FDA to determine which products it would regulate.[57]

## A.   THE MAJOR QUESTIONS DOCTRINE.

Article III of the Constitution assigns "[t]he judicial power of the United States" and imposes a corresponding duty on federal courts "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177-78 (1803). In turn, Article I vests the Congress with all federal legislative power, and "permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001).

The legislative "function belongs to Congress … and [it] may not be conveyed to another branch or entity." *Loving v. United States,* 517 U.S. 748, 758 (1996). This principle protects the sovereignty of the American people and the political accountability of those who govern them. *General Land Off. of Texas v. Biden*, 722 F.Supp.3d 700, 737 (S.D. Tex. 2024);

---

[57] FDA will undoubtedly assert that *Big Times Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2000) forecloses VDX's major question argument. *Big Time Vapes* was a pre-PMTA Non-Delegation Doctrine attack against the TCA's deeming provision which focused on FDA's sub-delegation of its deeming authority to inferior officers. VDX presents a different constitutional question rooted firmly in *Brown & Williamson* and its progeny. The Supreme Court has also applied the Major Questions Doctrine in manner since *Big Time Vapes* which lessens its value. This Court's also now has a different experience *vis-à-vis* FDA's implementation of salient aspects of the PMTA process than when deciding *Big Time Vapes*.

*Storio v. Borough of Point Pleasant Beach*, 322 F.3d 293, 300 (3rd Cir. 2003).

Legislative power is the:

> "authority, under the constitution, to make laws, and to alter and repeal them. Laws, in the sense in which the word is here employed, are rules of civil conduct, or statutes, which the legislative will has prescribed."

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 108 (5th Ed. 1883). This power is "a predetermination of what the law shall be" for future regulation. *Id.* The sanctity of legislative power, however, is compromised when Congress delegates broad authority to unelected bureaucrats like those at FDA to adopt policies having the force of law that do not reflect the will of the people.

The Major Questions Doctrine is baked into the interplay between the three branches to ensure continuity of the delicate synchronous orbit which Madison envisioned.[58] The Doctrine accomplishes this by cabining Congress from delegating its authority on issues of vast economic or political importance. Thus, agencies must identify clear congressional

---

[58] Federalist No. 51 at 319 (C. Rossiter ed. 1961) (Madison).

authority before seeking to claim legislative power over significant issues.

> "[T]he 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."

*West Virginia v. EPA*, <u>597 U.S. 697, 721</u> (2022), quoting *Brown & Williamson, supra.*, at 159-60.

Unlike improv comedy, legislation is generally not an "open book to which the agency [may] add pages and change the plot line." <u>597 U.S. at 723</u>, quoting Gellhorn & P. Verkuil, *Controlling Chevron-Based Delegations*, 20 Cardozo L. Rev. 989, 1011 (1999). Agencies must stick to the script and not *ad lib* their parts. As such, it is presumed that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." <u>597 U.S. at 723</u>. Congress must write the plot line and FDA must stick to it.

Arguably, the Doctrine finds its origin in the Constitution's Vesting Clause[59] such that legislative power requires Congress to decide "important issues" while leaving agencies to merely "fill up details." *West*

---

[59] <u>U.S. Const., Art. I, § 1</u>.

*Virginia*, at 737 (Gorsuch, J., concurring) (quoting *Wayman v. Southhard*, 23 U.S. (10 Wheat) 1, 42-43 (1825)). Alternatively, the Doctrine is grounded in the Constitution's "admittedly difficult" lawmaking process which:

> "effectively require[es] a broad consensus to pass legislation, the Constitution sought to ensure that any new laws would enjoy wide social acceptance, profit from input by an array of different perspectives during their consideration, and thanks to all this prove stable over time."

*Id.*, at 738, quoting Federalist No. 10, at 82-84 (J. Madison). Allowing Congress to delegate its legislative power to agencies would "dash [this] whole scheme." *Id.*, at 739, quoting *Department of Transportation v. Association of American Railroads*, 575 U. S. 43, 61, (2015) (Alito, J., concurring).

The Supreme Court has rigorously applied the Doctrine by invalidating broad agency mandates which lacked a clear Congressional authorization. *See e.g., Biden v. Nebraska*, 600 U.S. 477, 489 (2023); *West Virginia, supra; NFIB. v. OSHA*, 595 U.S. 109 (2022) (*per curiam*); *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 760 (2021) (*per curiam*).

Each case involved unelected and unaccountable bureaucrats seizing broad authority to regulate a major area of the economy absent a specific

congressional authorization. In some instances, Congress had expressly rejected some of the policies. *See NFIB*, at 122 (Gorsuch, J., joined by Thomas & Alito, JJ., concurring) (Congress chose not to afford OSHA the authority to issue a vaccine mandate and the Senate even voted no); *West Virginia*, at 724 (Congress had plainly and repeatedly declined to enact EPA's carbon dioxide emissions regulations); *Alabama Ass'n of Realtors*, at 760 ("the CDC decided to do what Congress had not.").

### B. TOBACCO PRODUCTS AND THE MAJOR QUESTIONS DOCTRINE.

So, what about tobacco products? *Brown & Williamson* demonstrated why the Major Questions Doctrine applies here because the salient inquiry is "not whether something should be done; it is who has the authority to do it," *Biden, supra.*, at 480. The Doctrine looks to the underlying statutory text and legislative history in determining the propriety of an agency assuming regulatory authority over a subject matter. *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 341 (2014). Here, prior precedent on the question is also critical.

The legislative history here shows a firm policy of congressional restraint *vis-à-vis* regulating tobacco products. Congress considered 75 smoking-related bills between the Surgeon General's landmark 1964

report on smoking and 1978.[60] Congress even went as far as *proposing* an amendment to the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq* (FFDCA) which would have granted FDA regulatory authority over all tobacco products.[61] Instead, Congress took a significantly more restrained step—enacting the first cigarette labeling act.[62] Before 2009, Congress's regulatory tact could be characterized in two ways: measured and glacial.

### C.  FDA's Prior Major Questions Doctrine History *vis-a-vis* Tobacco Products.

FDA, however, has not shared Congress's historic restraint. In 1996, FDA invoked the FFDCA to classify nicotine as a drug, and cigarettes as a drug delivery device. *See* 61 Fed. Reg. 44,619, *et. seq.* (Aug. 28, 1996). *Brown & Williamson* analyzed tobacco's historic and economic significance, observing that it concerned a "significant portion" of the American economy and occupied a "unique place in the nation's history

---

[60] Klebe, E.R., *Actions of the Congress and the Federal Government on Smoking and Health*, Congressional Research Serv., Report No. 79-219 (Sept. 26, 1979); *see also Brown & Williamson, supra.,* at 137-38.

[61] *See Bill to Amend the Federal Food, Drug, and Cosmetic Act so as to Make that Act Applicable to Smoking Products*, H.R. 2248, 89th Congress (1966).

[62] *See also*, Klebe, *supra.*

and society." <u>529 U.S. at 159-60</u>. The Court thus held the regulation of tobacco was a "major question" and FDA lacked regulatory authority over tobacco absent Congress passing specific enabling legislation.[63] *Id.*, at 126.

This holding conclusively bound Congress and FDA going forward. *Brown & Williamson* should have been a warning siren to Congress. The Supreme Court meant what it said. Congress did not listen.

### D.  CONGRESS'S DELEGATION OF DEEMING AUTHORITY VIOLATED THE MAJOR QUESTIONS DOCTRINE.

*Brown & Williamson* meant that Congress had to construct the blueprint of any regulatory framework for tobacco products. Identifying the scope of what to regulate—defining what constitutes a "tobacco product" and determining which ones to regulate—was the foundational cornerstone of any regulatory framework.

The TCA was Congress's response to *Brown & Williamson*; crafted upon the extant "tobacco product" definition. <u>21 U.S.C. § 321(rr)</u>. Like its earlier tobacco legislation, Congress did not go full throttle in its grant of

---

[63] *Brown & Williamson* was not FDA's only regulatory overreach involving tobacco products. Pre-TCA, FDA attempted to regulate ENDS products as a drug under the FFDCA. A court ended FDA's attempted power grab. *See Sottera, Inc. v. FDA*, <u>627 F.3d 891</u> (D.C. Cir. 2010).

regulatory authority. It cabined FDA's immediate regulatory authority to only four specific tobacco product subsets (cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco). 21 U.S.C. § 387a(b). Congress then delegated FDA the legislative authority to "deem" any other product subsets within its regulatory control. *Id.* In other words, Congress let the agency decide whether and when to regulate a substantial base of tobacco products. Worse, FDA failed to "provide standards for when and how [FDA] was to exercise its discretion to deem[.]" *Nicopure, supra.*, at 392. FDA cannot now explain away *Nicopure's* finding.

*Brown & Williamson* defined the constitutional limits concerning the regulation of tobacco products by saying that Congress, and only Congress, could authorize their regulation. Here, Congress merely authorized FDA to regulate four product subsets. It left the remaining products in the ether by punting their future status to FDA. Again, defining the scope of which tobacco products to regulate was at the core of any regulatory framework—a quintessential legislative function. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 428-29 (1935) (regulations are valid only as subordinate rules and when found to be within the

- 30 -

framework of the policy which the legislature has sufficiently defined); *Lopez-Munoz v. Barr*, 941 F.3d 1013, 1015 (10th Cir. 2019) ("Congress alone has the power to define the scope of an agency's authority.").

The propriety of delegating the authority to decide that open-system products should be regulated is the prime issue here. Congress honored *Brown & Williamson's* clear mandate when defining the scope of FDA's regulatory authority up to the point of the TCA's "deeming" provision. Congress could have ended any debate by immediately placing all "tobacco products" under FDA's control. Instead, Congress knew ENDS products existed when debating the TCA;[64] it nevertheless excluded them from the products listed in 21 U.S.C. § 387a(b); and it has never amended the statute to include them.[65] This delegation of legislative authority disregarded *Brown & Williamson's* major questions holding.[66]

---

[64] *See e.g.* 155 CONG. REC. No. 50, H3802 - H3805 (Mar. 24, 2009) (statement by Rep. Buyer); 155 CONG. REC. No. 82, S6009 - S6012 (Jun. 3, 2009) (statement by Sen. Burr).

[65] Congress's 2022 amendment of the "tobacco product" definition to capture synthetic nicotine products did not alter the 21 U.S.C. § 387a(b) list of tobacco products. *See* Consolidated Appropriations Act, 2022, PUB. L. 117-103, div. P., tit. I, subtitle B, 136 STAT. 49, 789-92 (Mar. 15, 2022).

[66] VDX is not the only one questioning the propriety of FDA invoking its deeming authority. *See Cigar Ass'n, supra.*, which held that FDA arbitrarily deemed premium cigars; vacating the Deeming Rule as to those products. FDA did not seek *certiorari* and the D.C. Circuit's opinion is final. This

Congress compounded this unlawful legislative delegation by failing to provide standards to guide FDA's exercise of its authority to deem additional tobacco products. *Nicopure, supra.* FDA agreed in arguing that:

> "Congress's choice of the deferential word 'deems' and the absence of any standard—beyond the requirement that the product meet the 'tobacco product' definition—demonstrate that Congress committed the exercise of this authority to the agency's broad discretion."[67]

*Id.*, at 392. Congress did not guide FDA as to the when, how, and why of a deeming decision. Further, FDA's broad discretion, however, begs the question, given *Brown & Williamson*'s clear mandate, that Congress delineate the products to be regulated. The TCA's "deeming" provision is unconstitutional.

Moreover, what VDX seeks is directly in line with Section 2 of Executive Order 14219, 90 FED. REG. 10583 (Feb. 19, 2025). The gist of the Executive Order requires all agencies to initiate the culling all:

> "unconstitutional regulations and regulations that raise serious constitutional difficulties, such as

---

Court could also plausibly hold the Deeming Rule is arbitrary as to open-system ENDS products.

[67] The lack of guiding standards also presents a non-delegation doctrine question. *See Ryan, supra.*, at 430; *J.W. Hampton, Jr. & Co. v. U.S.*, 276 U.S. 394, 409 (1928).

> exceeding the scope of the power vested in the Federal Government by the Constitution" and "regulations that are based on unlawful delegations of legislative power."

*Id.* The White House later clarified that agencies are to undertake their analysis after considering 10 key Supreme Court rulings, including *Loper* and *West Virginia*.[68]

The TCA's deeming provision, and FDA's resulting Deeming Rule, are unconstitutional because Congress violated *Brown & Williamson's* clear and unambiguous major questions mandate when delegating the legislative authority to add to the product subsets enumerated in 21 U.S.C. § 387a(b). This violation then led FDA to the implement the TCA in an arbitrary manner *vis-à-vis* open-system ENDS products. This Court acknowledged that arbitrariness in *Wages*, 90 F.4th at 384, n.5 (FDA failed to adhere to the TCA's required rulemaking process before adopting a standard regulating the inclusion of flavors in ENDS

---

[68] The White House, *Fact Sheet: President Donald J. Trump Directs Repeal of Regulations That Are Unlawful Under 10 Recent Supreme Court Decisions* (Apr. 9, 2025) https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-directs-repeal-of-regulations-that-are-unlawful-under-10-recent-supreme-court-decisions/

products).[69] The fact that 12 separate federal circuit courts, the Supreme Court, FDA and numerous industry stakeholders have had to devote so much time and effort to adjudicate the multitude of flavored open-system ENDS product PMTA challenges is the best evidence why Congress had to specifically tell FDA which tobacco products to regulate. Undoubtedly, Congress must amend 21 U.S.C. § 387a(b) accordingly if it desires that FDA regulate open-system ENDS products.

The Court should thus determine the TCA's "deeming provision," and FDA's 2016 Deeming Rule based thereon, are unconstitutional as to open-system flavored ENDS products. Any finding of unconstitutionality mandates a grant of review which vacates the MDO.

## II.  THE APPH STANDARD IS UNCONSTITUTIONALLY VAGUE

If the Court upholds the TCA's deeming provision, it must also address whether its APPH standard is unconstitutionally vague as to flavored open-system ENDS products. The test of vagueness is whether a statute is "so vague and indefinite as really to be no rule or standard at all." *Exxon Corp. v. Busbee*, 644 F.2d 1030, 1033 (5th Cir. 1981), citing A. B. *Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239 (1925).

---

[69] The Supreme Court left this issue for future adjudication. 145 S.Ct. at 916.

A statute is unconstitutional if it fails to provide fair notice of its requirements. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497-98 (1982). A regulatory process is vague and indefinite if it forces regulated parties to shoot blindfolded at a moving target when attempting to satisfy its requirements.

### A. PUBLIC HEALTH IS AN OPEN-ENDED AND AMBIGUOUS CONCEPT.

The first thing the Court must unpack is what constitutes the "*public health.*" The TCA and the FFDCA are both statutory rubrics devoted to public health, yet curiously, neither define the term. Unlike "obscenity," *Jacobellis v. Ohio*, 378 U.S. 184 (1964), the concept of "public health" is not something you immediately know when you see it.

The factors comprising the concept of "public health" are virtually infinite and involve divergent and competing interests given the diversity of the "population as a whole." Imagine the "public health" concept as a complex math equation having many levels of variables such that an error in any single variable will result in a wrong answer. Multiple errors do not balance the equation; they only compound the wrong answer. Multiple errors matter in an APPH analysis because the TCA requires a balancing of benefits and risks. This is why the standard expressed in

*Fontem US, LLC v. FDA*, 82 F.4th 1207, 1217 (D.C. Cir. 2023) is

unworkable because the invalidity of a single APPH element impacts the

corresponding weight on the other side of the scale. Multiple errors only

magnify that impact.

 The term "public health" is broad and almost limitless in scope, being

defined as:

> "the art and science dealing with the protection and
> improvement of community health by organized
> community effort and including preventive
> medicine and sanitary and social science."[70]

Black's Law Dictionary offers a broader definition:

> "the health of the community at large" or, more
> narrowly, the methods of maintaining the health of
> the community, as by preventive medicine and
> organized care for the sick."[71]

The open-ended breadth of the TCA's "public health" and "population as

a whole" concepts require an analysis of varied facets beyond the general

benefits and risks to tobacco users and non-users set forth in 21 U.S.C. §

---

[70] *Public Health,* Merriam-Webster Dictionary,
https://tinyurl.com/7mtz87ms

 *Public Health,* Encyclopaedia Britannica ("the art and science of
preventing disease, prolonging life, and promoting physical and mental
health, sanitation, personal hygiene, control of infectious diseases, and
organization of health services"), https://tinyurl.com/3tvk3cem

[71] *Health,* Black's Law Dictionary (12th ed. 2024) (including "public
health" as a sub-definition).

387j(c)(4) because those benefits and risks vary by population demographic.

FDA's problem is two-fold: the TCA fails to guide how it must weigh often divergent and competing public health considerations and contains few limits on what evidence satisfies the APPH standard.[72] The virtually infinite list of possible public health considerations in a population as diverse as America, absent limits, makes a regime susceptible to an entirely subjective weighing of the various, divergent, and competing APPH factors. For instance, FDA must weigh the benefits which ENDS products offer to adult smokers and counterbalance the risks to youth non-users. Yet, the TCA does not guide FDA in determining how it must weigh the benefits to adults versus the risks to youths. The TCA does not articulate how many adult smokers must be converted by a particular flavored ENDS product versus how many youth users of that product are too many. This failure is critical because FDA cannot articulate that a particular VDX flavored product must convert X-number of smokers to be considered effective.

---

[72] The TCA requires "well-controlled investigations" but offers no clarification of the pertinent factors governing them. 21 U.S.C. § 387j(c)(5)(A).

Analyzing the APPH standard's vagueness raises questions not addressed by either the TCA or FDA's rules and guidance. Assume that consumers using VDX's flavored ENDS products to reduce or stop smoking produce overall lower negative health impacts across all population demographics, FDA has failed to articulate whether such fact would represent a sufficient offset to account for those youths who use ENDS products that would not otherwise do so. Or, must FDA consider the use of other open-system ENDS products by youths to quit smoking or in lieu thereof as a mitigating factor in an APPH analysis? The TCA suggests an answer in the affirmative because youths are, after all, part of the "population as a whole" and their use of ENDS products to quit smoking is a positive APPH factor which FDA must weigh in a product's favor. *See* 21 U.S.C. § 387j(c)(4)(A).

The importance of FDA's failure is evidenced by the 2021 NYTS which showed that 2.5% of youths reported using ENDS products to quit smoking.[73] FDA's TPL omitted any discussion that it considered this

---

[73] Gentzke, A., *et al. Tobacco Product Use and Associated Factors Among Middle and High School Students* — National Youth Tobacco Survey, United States, 2021. MMWR Surveill. Summ. 2022;71(No. SS-5):1–29, Table 6. Ironically, the NYTS stopped asking the smoking cessation/reduction question after 2021.

factor, or accounted for the mitigating factor that its own compliance data does not show that youths use VDX's products.[74] These were an "an important aspect of the problem" which FDA arbitrarily failed to consider because it presumes that youth use of ENDS products can never have a beneficial public health impact. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agencies must "consider an important aspect of the problem"). The TCA clearly and unambiguously requires that FDA consider such benefits because youths are part of the "population as a whole." FDA got another variable wrong.

## B.  THE APPH STANDARD LACKS ASCERTAINABLE STANDARDS.

As evidenced above, the APPH standard is nebulous and bereft of ascertainable standards. A regulatory structure which lacks an "ascertainable standard" cannot survive constitutional scrutiny. *U.S.* v. *L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). Permitting the enforcement of such a structure fails the Constitution's requirement that Congress "suppl[y] an intelligible principle to guide the delegee's use of discretion." *Gundy* v. *United States*, 588 U.S. 128, 135-136 (2019).

---

[74] None of VDX's products are listed on FDA's violation database. *See* https://timp-ccid.fda.gov/

Congress authorized FDA to make regulatory determinations that require effective omniscience but provided very scant guiding or limiting principles for balancing an almost unlimited array of competing public health variables. One could get dizzy pondering the permutations of possible public health outcomes presented by a given situation, yet Congress provided no guiding roadmap. For example, FDA requires proof that a flavored product is effective at reducing or stopping smoking. Neither the TCA nor FDA have defined an efficacy benchmark. VDX cannot thus discern how many smokers its products must convert to be effective. The APPH standard is unconstitutionally ambiguous for this reason.

### C. FDA's Interpretation of the APPH Standard Fails to Account for Adverse Consequences.

Public health choices do not exist in a vacuum and must account for adverse consequences. Here, one adverse consequence of FDA's interpretation of the APPH standard to ban flavored ENDS products has been the perpetuation of a black market which peddles unsafe products. Prohibition was a health-driven policy initiative that, while well-intended, resulted in the manufacture, sale and consumption of mass

quantities of illicit, less-safe alcohol,[75] say nothing about the organized criminal syndicates who peddled it. FDA's misguided policies concerning flavored ENDS products demonstrate the accuracy of Winston Churchill's observation that "[t]hose that fail to learn from history are doomed to repeat it."

In January 2020, FDA banned flavored closed-system pod products pending their PMTA review.[76] It then prohibited all flavored open-system products through PMTA adjudications. Chinese manufacturers quickly responded by flooding the market with limitless brands of closed-system flavored disposable products.[77] Like Prohibition, there are no guardrails on these imported products. The bootleggers this time are Chinese instead of Italian or Irish gangsters; same game, different players.

FDA has ignored these critical variables, all of which impact the concept of public health—the heart of the APPH standard—in making its PMTA adjudications. Sadly, the youths which FDA sought to protect by

---

[75] Miron, J., *et al., Alcohol Consumption during Prohibition*, 81 AM. ECON. Rev. 242 (1991).

[76] *See* FDA Enforcement Guidance, *supra.*, at 9-10.

[77] Matsakis, L., *The US Is Being Flooded by Chinese Vapes*, Wired, Jun. 25, 2024.

banning flavored products flocked to the illicitly imported disposable products. FDA's prohibitionist policies are on the wrong side of history.

Another example of an unintended consequence would be if FDA's fixation with banning flavored products resulted in the counterproductive result of increasing youth smoking. 21 U.S.C. § 387j mandates that FDA balance a tobacco product's effect in reducing adult smoking against youth initiation of **all** tobacco products. Smoking cessation, after all, was one of the key TCA goals. *See* TCA § 2(34), 123 STAT. 1776, 1779 (Jun. 22, 2009) (the only known safe alternative to smoking is cessation; interventions should help all smokers to quit completely).

The past decade has seen significant reductions in both adult and youth smoking (from 16.8% to 11% for adults between 2014 and 2024,[78]/[79]

---

[78] *Jamal, A, et. al.*, Current Cigarette Smoking Among Adults — United States, 2005–2014, MMWR MORB. MORTAL WKLY. Rep. 2015:64(44);1233-1240 (Nov. 13, 2015).

[79] *Jones, J.*, Cigarette Smoking Rate in U.S. Ties 80-Year Low, Gallup (Aug. 13, 2024).

and from 9.2% to 1.4% for youths during that period).[80]/[81] Yet, the risk of reversing these reductions is another unintended consequence of FDA's tact regarding flavored ENDS products. The Yale School of Public Health (Friedman) study, *supra.*, demonstrated an increase in the sale of youth-preferred cigarette brands in jurisdictions which banned flavored ENDS products. A follow-up study analyzed comprehensive cross-sectional behavioral risk data derived from 2018 to 2023 in concluding that restrictions on flavored ENDS products resulted in increased smoking.[82] Stated bluntly, FDA's fixation with keeping flavored ENDS products out of the hands of youths has led them to smoke. This result flies in the face of Congress's intent to reduce smoking and negates any public health benefits which FDA sought to achieve in banning flavored ENDS products.

Imagine if the King of Spain made Columbus set sail from Castile in 1492 with nothing more than the vague instruction to find the Americas.

---

[80] *Arrazola, R., et. al.*, Tobacco Use Among Middle and High School Students — United States, 2011–2014, MMWR MORB. MORTAL WKLY. Rep. 2015:64(14);381-385 (Apr. 17, 2015).

[81] *Jamal A.* (2015), *supra.*

[82] Friedman A., *et. al.,* Flavored E-Cigarette Sales Restrictions and Young Adult Tobacco Use, JAMA HEALTH FORUM, 2024:5(12) (Dec. 27, 2024).

What was the ultimate destination? What was he to do upon arriving? Congress and the FDA have placed ENDS product manufacturers and FDA in precisely this situation by crafting a regulatory regime upon an infinitely open-ended concept while failing to provide meaningful guidance to better understand that concept. The Court should find that 21 U.S.C. § 387a(b)'s "deeming" provision is unconstitutional.

### III. FDA Unlawfully Instituted a *De Facto* Ban on Non-Tobacco Flavored Products

The Court must next consider the propriety of how FDA has chosen to regulate flavored ENDS products given the TCA's clear and unambiguous requirement to adopt a tobacco product standard. *Chenery II, supra.,* mandates compliance with a required statutory rulemaking process in lieu of regulating by adjudication unless a narrow exception applies. 332 U.S. at 202-03. *See also* 145 S.Ct. at 915.

Congress addressed the adoption of tobacco product standards in the TCA by enacting the cornerstone product standard which banned the inclusion of non-menthol flavors in cigarettes. *See* 21 U.S.C. § 387g(a)(1). Congress authorized FDA to create additional tobacco product standards through a formal APA-style rulemaking process. *Id*., at § 387g(c).

## A. FDA's Comparative Efficacy Standard is a Disguised Tobacco Product Standard Adopted Contrary to the TCA.

A tobacco product standard concerns a product's "components, ingredients [or] additives." 21 U.S.C. § 387g(a)(4)(B)(i). The TCA defines the term "additive" as being:

> "any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristic of any tobacco product (including any substances intended for use as a ***flavoring*** or coloring or in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding)...." (Emphasis added).

*Id.*, at § 387(1). Congress set forth the procedure for FDA to adopt a tobacco product standard in 21 U.S.C. § 387g(c) by requiring that it:

> "publish in the Federal Register a notice of proposed rulemaking for the establishment, amendment, or revocation of any product standard,"

21 U.S.C. § 387g(c)(1). Congress also addresses the structural requirement of the public notice, *id.*, at § 387g(c)(2); overlapping the elements of the APA's general rulemaking requirement set forth in 5 U.S.C. § 553(b).

FDA's 2020 enforcement guidance both confirms the applicability of the 21 U.S.C. § 387g product standard requirements and acknowledges that "restricting or eliminating" flavors is a "product standard."[83] Another confirmation: FDA's proposed ban on the inclusion of menthol as a flavoring in cigarettes acknowledged that regulating the inclusion or exclusion of flavorings to tobacco products is a product standard.[84] It is undisputed that FDA has not sought to promulgate a tobacco product standard relating to flavored ENDS products through notice-and-comment rulemaking.

FDA is trying to accomplish indirectly through *ad hoc* PMTA adjudications what it cannot accomplish through the TCA's rulemaking process. In 2014, FDA's proposed Deeming Rule sought to ban flavors in all tobacco products through the TCA's rulemaking process. However, the Office of Management and Budget struck FDA's proposed flavored tobacco product standard.[85] If FDA could not get a flavored tobacco ban

---

[83] *See* FDA Enforcement Guidance, *supra.*, at 34.

[84] FDA, *Tobacco Product Standard for Menthol in Cigarettes*, 87 FED. REG. 26,454, 26,456 (May 4, 2022).

[85] *See* OMB Mark-Up - FDA-2014-N-0189-83193, OMB Docket No. 2014-850 at 167 – 180. https://www.dropbox.com/scl/fi/tz9sh8gxum121vbxdxei8/OMB-Mark-Up-

past the Obama administration, it has little hope of doing so with the Trump administration.

To date, FDA has applied its comparative efficacy standard to deny marketing to all flavored open-system products.[86] The fact that FDA draws a distinction between non-tobacco flavored products and tobacco-flavored products evidences a policy concerning an "additive" to tobacco products. This Court correctly observed in *Wages* that FDA has implemented a *de facto* ban. 90 F.4th at 384, note 5. The same is true here.

### B. *CHENERY II* COMMANDS FDA'S ADHERENCE TO THE TCA'S RULEMAKING REQUIREMENT

In *Chenery II*, the Supreme Court upheld an agency's discretion to regulate through either formal rulemaking or adjudications when a statute authorizes such choice. 332 U.S. at 203. The Court, however, held that agencies must adhere to any rulemaking process stated in enabling legislation. *Id.*, at 202-03. The Supreme Court did not waiver from this

---

FDA-2014-N-0189-
83193_content.pdf?rlkey=25gjsy0zexq8fme3w3q9ce8os&dl=0.

[86] FDA's comparative efficacy requirement of a also puts flavored ENDS product manufacturers in a catch-22 because FDA also prohibits comparative product claims absent a modified risk marketing order. 21 U.S.C. § 387k. Manufacturers must thus violate the law to comply with FDA's mandate.

position when discussing the product standard issue in *Wages*. *See* [145 S.Ct. at 915-16](#).

The TCA unquestionably requires that FDA engage in APA-style rulemaking when implementing a tobacco product standard. FDA thumbed its nose at this requirement by enforcing the comparative efficacy standard through *ad hoc* PMTA adjudications. The result has been the approval of less than 50 ENDS products, none of which are non-tobacco or non-menthol flavored; thus, representing a mere 0.000333% of all ENDS products.[87]

To the extent that further inquiry is needed, FDA's development of a policy through adjudications rather than formal rulemaking "may affect the degree of deference" to be afforded. *Gonzalez v. Reno*, [212 F.3d 1338, 1350](#) (11th Cir. 2000). *Loper, supra.,* requires an analysis of the "thoroughness" of the agency's reasoning. [603 U.S. at 432](#). It is a novel question here whether deference concerning *ad hoc* PMTA adjudications post-*Loper* should be applied based upon *Chenery II's* admonition of adherence to a statutorily mandated rulemaking process when

---

[87] FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (Jun. 21, 2024).

implementing broad policy initiatives. The Court should vacate the MDO because FDA's comparative efficacy standard violates 21 U.S.C. 387g.

## C. FDA CANNOT INVOKE *CHENERY II'S* EXCEPTIONS.

FDA cannot look to *Chenery II's* narrow "specialized problem" exception. This exception allows regulation by *ad hoc* adjudication when agencies: (1) lack "sufficient experience," (2) the issue was not reasonably foreseeable, or (3) are dealing with circumstances "so specialized and varying in nature" that it is "impossible" to capture such circumstances with a general rule. 332 U.S. at 202–03. None of these apply here. As argued, *supra.*, FDA rooted its *de facto* ban upon a perception of the youth risks of flavored ENDS products as evidenced by its TPL. The "specialized problem" exception must be viewed through the prism of that perception.

### i. *CHENERY II'S* SUFFICIENT EXPERIENCE EXCEPTION DOES NOT APPLY

FDA cannot plausibly argue that it lacks "sufficient experience" with the perceived youth risks posed by flavored ENDS products. They have, after all, been marketed since 2006 in the United States,[88] and *Sottera, supra.*, evidences that FDA's experience goes back to at least April 2009.

---

[88] Fadus, M., *The Rise of E-Cigarettes, Pod Mod Devices, and JUUL Among Youth: Factors Influencing Use, Health Implications, and Downstream Effects*, *Drug Alcohol Depend.*, 201:85-93 (Aug. 1, 2019).

FDA was certainly aware of any perceived risks of flavored ENDS products in April 2014 when seeking a ban in the proposed Deeming Rule.[89] It expressed concerns about flavored ENDS products *vis-à-vis* youth on no less than 5 pages of the proposed Deeming Rule.[90] FDA thus had experience with any associated risks of flavored ENDS products for nearly 5 years prior to adopting its comparative efficacy standard. The experience was more than sufficient to negate this *Chenery II* exception.

### ii. CHENERY II'S LACK OF REASONABLE FORESEEABILITY EXCEPTION DOES NOT APPLY

FDA can also not plausibly argue the reasonable unforeseeability of any perceived youth risks prior to conducting its PMTA adjudications. FDA justified the proposed Deeming Rule's attempt to ban flavored tobacco upon a perception of their risks posed to youths.[91] FDA knows from its prior actions, discussed *supra.*, that any product standard concerning flavors must adhere to the TCA's rulemaking process. FDA

---

[89] FDA, *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 79 FED. REG. 23,142, *et. seq.* (Apr. 25, 2014).

[90] *See e.g., ibid.*, at 23,144, 23,146 - 23,148 and 23,157.

[91] *Ibid.*

also knows that pathway is foreclosed but nevertheless tried to do indirectly through *ad hoc* PMTA adjudications what it could not accomplish directly through rulemaking.

### iii. *CHENERY II'S* SPECIALIZED CIRCUMSTANCES EXCEPTION DOES NOT APPLY

Finally, FDA cannot plausibly argue that any perceived youth risks are "so specialized and varying in nature" that it was "impossible" to capture them through the traditional APA-style rulemaking process. FDA followed that traditional process in both the proposed Deeming Rule and its recent attempt to ban menthol cigarettes.[92] FDA's prior unsuccessful use the TCA rulemaking process completely obliterates any present argument that the specialized circumstances exception could apply.

In sum, FDA cannot seek shelter in the *Chenery II's* safe harbors to avoid the TCA's clear and unambiguous rulemaking requirement. FDA's implementation and enforcement of its comparative efficacy standard is *ultra vires* and warrants the Court both vacating the MDO, and remanding VDX's PMTA for reconsideration, absent the application of

---

[92] FDA, *Tobacco Product Standard for Menthol in Cigarettes*, 87 FED. REG. 26,454 (May 4, 2022).

the comparative efficacy requirement, within the 180-day period set forth in 21 U.S.C. § 387j(c)(1)(A).

## IV.  FDA ARBITRARILY APPLIED THE APPH STANDARD

Finally, review is warranted because FDA arbitrarily ignored key APPH elements *vis-a-vis* VDX's PMTA. The APPH standard looks to "the risks and benefits as to the population as a whole," and evaluates the increased or decreased likelihood that existing users and non-users of tobacco products will either stop or start using them. 21 U.S.C. § 387j(c)(4). Congress did not articulate definitive metrics for evaluating these likelihoods and risks but instead mandated that FDA balance them against each other. *Id.* Congress and FDA, however, neither offered guidance concerning how to accomplish this balancing nor articulated key variables necessary to do so.

FDA acted arbitrarily analyzed VDX's PMTA by: (1) relying upon a perception of youth risks rooted in stale and irrelevant data and (2) failing to adhere to the TCA's "population as a whole" metric.

## A. FDA Rooted Its APPH Analysis Upon Stale Youth Use Data and Refused to Change Course as Data Changed.

Black letter administrative law mandates that agencies "examine the relevant data" and:

> "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."

*BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023). Courts must set aside actions that "fail[] to account for relevant factors or evince[] a clear error in judgment." *Id. Loper* requires "independent judgment," and considering the "thoroughness of the agency's reasoning," 603 U.S. at 393, 432, when interpretating an ambiguous standard.

FDA thus no longer can articulate a policy position, rely upon cherry-picked data, and then expect reflexive judicial acceptance. This is particularly relevant here because FDA's position *vis-à-vis* open-system flavored products rests upon stale, irrelevant and manipulated youth use data. FDA based its perceptions upon old data which did not reflect then-current youth usage statistics—data which showed massive reductions in youth ENDS product usage.

FDA based its MDO and the supporting TPL upon the general premise that flavored ENDS products pose a "significant risk to youth," based upon a prior finding of an "epidemic."[93] FDA's premise did not distinguish between open-system and closed-system products, opting to apply its premise universally. FDA rooted its "epidemic" characterization upon pre-2022 youth usage and flavor preference data.[94] FDA, however, relied upon an evidentiary sleight of hand by deceptively framing youth flavor preferences as a percentage of all youths who used particular flavors without disclosing that such figure was really a percentage of a much lower percentage.

FDA's TPL cited a study which postulated that 38.3% of all "current"[95] youth users preferred candy, dessert and sweet flavors based upon the 2022 NYTS.[96] Table 2 below demonstrates FDA's intellectual dishonesty: framing the 38.3% figure from the 2022 NYTS, but ignoring that only

---

[93] APPX. 132-133 (ADMIN. REC. 187–188).

[94] APPX. 133 (ADMIN. REC. 188, n. x).

[95] A "current user" is any youth that takes a single drag off a single ENDS product in the past 30 days.

[96] *Id.*, citing *Cooper, M, et. al., Notes from the field: E-cigarette use among middle and high school students-United States, 2022.* MMWR MORB, MORTAL WKLY, REP. 2022;71(40):1283- 1285 (Oct. 7, 2022).

12.6% of youths were "current" users:[97]



**Table 2**

Thus, a 38.3% youth flavor preference yielded a 4.8% actual use statistic (38.3% of 12.6%) for candy, dessert and sweet flavors.

*Loper* does not bind the Court to accept FDA's attempted evidentiary sleight of hand. The Court must find for VDX unless it can say that FDA's reliance upon stale and distorted data represents the type of thoroughness which *Loper* contemplated. Moreover, Table 2 evidences the significance of FDA's refusal to consider youth use data beyond 2022 as youth "current" use dropped from 12.6% in 2022 to 8.6% in 2023 (a

---

[97] *Ibid.*

31.7% reduction) and then to 6.6% in 2024 (another 23.3% reduction and a 47.6% aggregate reduction from 2022). The current rate shows a drop of more than 70% from the 2019 highwater "epidemic" mark. This latter fact was the data before FDA when it adjudicated VDX's PMTA.

To contextualize matters, Table 3 below represents the 2024 NYTS youth tobacco use frequency statistics:



**Table 3**

"Frequent use," of ENDS products, defined as 20 or more times per month, presently represents only 2.3% of all youths. FDA had a desired policy position and manipulated the data to justify it. *Loper* does not require the Court to accept this attempted evidentiary sleight of hand.

A new longitudinal study crystalizes the magnitude of FDA's fixation in observing that the youth "epidemic" was transient and experimental (52% of users at the 2019 watermark had stopped by 2021 and 60% reduced their use).[98] FDA's 2018 pronouncement of an "epidemic" represented an initial policy position based upon then-emerging youth use data.[99] Yet, FDA acknowledged in its TPL[100] that:

> "[a]s the known risks increase or decrease, the burden of demonstrating a substantial enough benefit likewise increases or decreases."

That train only runs one way as FDA refuses to adjust its policies *vis-à-vis* flavored open-system products to a less restrictive tact as youth use fell. Moreover, FDA's presumption about the attractiveness of flavored products arbitrarily ignored both its prior recognition that few youths use open-system products,[101] and its own compliance records which fail to

---

[98] Kim, S., *et al., Persistence of Youth Use of Electronic Nicotine Delivery Systems in the Population Assessment of Tobacco and Health, 2017-2021.* SUBSTANCE USE & MISUSE, 1–7 (Jun. 30, 2025). https://doi.org/10.1080/10826084.2025.2525380

[99] FDA, *Statement from FDA Commissioner Scott Gottlieb, M.D., on New Steps to Address Epidemic of Youth E-cigarette Use*, (Sept. 11, 2018).

[100] APPX. 132 (ADMIN. REC. 187).

[101] *See* FDA Enforcement Guidance, *supra.*, at 42-44.

show any youth sales of VDX's flavored products.[102] FDA, however, had continued to regulate as if it is still 2019 and the reductions in youth use never occurred. This is arbitrary on its face.

In sum, FDA rooted its position *vis-à-vis* open-system flavored ENDS products upon stale, superseded and irrelevant youth usage data which bore no relation to the circumstances existing when it reviewed VDX's PMTA. This was certainly a failure to both "consider an important aspect of the problem," *State Farm, supra*., and conduct a sufficiently thorough analysis necessary to satisfy *Loper*.[103] FDA's failure to adjust course as youth ENDS use data shifted downward is a textbook example of arbitrary action.

## B. FDA FAILED TO ADHERE TO THE TCA'S "POPULATION AS A WHOLE" METRIC.

21 U.S.C. § 387j mandates that FDA base any APPH determinations upon the benefits and risks to "population as a whole." It ignored Congress's mandate by focusing wholly on two subpopulations and

---

[102] *See* FDA Tobacco Compliance Check Outcomes. https://timp-ccid.fda.gov/

[103] In *Wages*, the Supreme Court noted that review of a PMTA denial "is narrow" and the court must "exercise appropriate deference." 145 S.Ct. at 917. The Supreme Court, however, did not supplant the deference standard it articulated in *Loper*.

subfactors: the proven benefit in transitioning adult smokers versus the risk of youth access.

FDA acknowledges it only considered the respective benefits and risks of VDX's flavored ENDS products across the two identified subpopulations and subfactors.[104] FDA's justification for this deviation: those subpopulations raised the "most significant public health concerns,"[105] and were "the most relevant in evaluating the impact on the population as a whole."[106] Congress, however, did not countenance such a limited APPH inquiry.

FDA selectively rooted its position *vis-à-vis* flavored products upon data which noted a purported "variability in the popularity of device types among youth," and a fluidity of popularity, because youths switched to disposable closed-system products after its enhanced enforcement against pod-based products.[107] FDA extrapolated its "variability" position

_____

[104] APPX. 129 (ADMIN. REC. 184).

[105] *IBID.*

[106] APPX. 129-130 (ADMIN. REC. 184–185).

[107] APPX. 138 (ADMIN. REC. 193).

from a lone sentence in the 2021 NYTS[108] which noted that some youths reported using open-system products.[109] FDA, however, omitted both that the open-system usage rate was only 9.0% of all users[110] and the use of disposable products substantially decreased since 2022 after enhanced enforcement efforts without a corresponding increase in using open-system products.[111] FDA recognizes these products, like those manufactured by VDX, lack youth-attractive design features and its own retail compliance data does not evidence minors using them.[112]

These distinctions matter because lower youth risks decrease the magnitude of adult benefits required to satisfy the APPH standard.[113] Discerning youth risks was thus an "important aspect of the problem."

---

[108] FDA reliance upon the 2021 NYTS represents the use of stale data as the NYTS has been updated three times since 2021, and each year showed a significantly reduced rate of youth usage.

[109] APPX. 138 (ADMIN. REC. 193).

[110] Park-Lee, E., *Notes from the Field:* E-Cigarette Use Among Middle and High School Students - National Youth Tobacco Survey, United States, 2021. MMWR MORB. MORTAL WKLY. Rep. 2021;70:1387, 1388.

[111] *See, e.g.,* FDA, *CPB, FDA Seize Counterfeit, Unauthorized E-Cigarettes, FDA News Release*, Jan. 13, 2021 (FDA press release regarding its December 2020 seizure of 33,000 flavored disposable ENDS products).

[112] *See* FDA Tobacco Compliance Check Outcomes, *supra.*

[113] Appx. 131-132 (ADMIN. REC. 186–187).

*State Farm, supra.*, at 43, yet FDA refused to consider: (1) the significant reduction in youth use after the 2019 highwater mark; (2) whether the downward youth use trend enhanced the efficacy of VDX's marketing plan; or (3) its own data showing that youths do not use VDX products. These were all relevant variables in the APPH equation which FDA failed to balance. In fact, FDA neither based its APPH determination upon a "balancing" of *all* risks and benefits,[114] nor articulated an explanation of how reduced harm and low youth use rates impact an APPH determination. Its failure to do so warrants relief.

### C. FDA ARBITRARILY APPLIED THE APPH STANDARD CONCERNING VDX'S MARKETING PLAN.

FDA's pre-PMTA guidance and proposed PMTA rule uniformly articulated the importance and critical nature of a manufacturer's marketing plans[115] and included examples of recommended elements.[116] The elements of VDX's marketing plan matched those recommendations or exceeded them:

- targeting adult smokers over age 35 in higher income groups;

---

[114] 21 U.S.C. § 387j(c)(4); FDA Enforcement Guidance, *supra.*, at 20.

[115] 86 FED. REG. at 55,323.

[116] *See* FDA PMTA Guidance, *supra.*, at 12, 25.

- marketing and selling products only to legal adult tobacco product users;

- respecting the law and viewing compliance with the law as a minimum standard;

- refraining from imagery or designs that might violate or infringe upon a trademark and/or trade dress protections;

- refraining from selling products to consumers under age 21; and

- limiting sales channels to adult-only retail establishments and online retail sites with adequate online age verification software.[117]

To that end, the Four Seasons products have a clean, adult-oriented branding and trade dress which does not use cartoons, loud colors, or gimmicky images.[118] This is precisely the type of branding which FDA represented that it desired. VDX dares FDA to argue its branding and trade dress is child-appealing.

### i. VDX'S MARKETING PLAN WAS A RELEVANT APPH FACTOR AND ADDRESSED AN IMPORTANT PART OF THE PROBLEM WHICH FDA SOUGHT TO ADDRESS.

FDA refused to review VPX's marketing plan for the sake of efficiency was arbitrary because the content thereof is a "relevant factor" which

---

[117] *See* ECF #11 at A124–A128.

[118] *IBID.*, at A114–A122.

addressed "an important aspect of the problem" being considered. *State Farm, supra.*, at 43. FDA's refusal is critical because it anchored the position *vis-à-vis* flavored open-system products upon the then-current data presented in the 2020 NYTS. That data reflected that 16% of youths were "current users" of ENDS products. *See* Table 2 *supra*. The NYTS for subsequent years, however, showed a rate decrease to 6.6% (representing a 60.2% decrease) by the time FDA conducted its PMTA review in September 2024. *Id*. FDA arbitrarily ignored this reduction as a key variable of the APPH equation.

An agency rule is "arbitrary and capricious if [it] . . . entirely failed to consider an important aspect of the problem . . . ." *State Farm, supra.*, at 43. An agency acts arbitrarily, for instance, when it takes a position that runs counter to the evidence or reaches an "implausible" decision. *Id*. FDA's position *vis-à-vis* the elements of VDX's marketing plan fails in both respects.

FDA represented in the TPL that it evaluates marketing plans "in the context of the overall public health evaluation of the product, weighing the risks to youth against the benefits to adults."[119] This suggests that

---

[119] Appx. 128 (ADMIN. REC. 183).

FDA raises or lowers the evidentiary bar as youth ENDS product use increases or decreases. This makes sense, but there is no dispute that youth usage had fallen significantly (nearly 60%) between the time FDA formulated its policy position in 2021 and it reviewed VDX's PMTA in 2024.

There is also no dispute that FDA refused to explain why the above-described decrease did not require that it lower the evidentiary bar. There is likewise no dispute that FDA refused to alter its position *vis-à-vis* flavored open-system products as youth usage decreased despite assurances that the placement of the evidentiary bar depended upon that metric. This was arbitrary on its face as FDA's position is contrary to the evidence and reaches an implausible decision.

### ii. FDA Has Failed to Explain Its Claim That VDX's Marketing Plan Elements Are Insufficient

Another problem for FDA concerns its claim in the TPL that the elements of VDX's marketing plan have proven ineffective at curbing youth access without articulating any explanatory justification. The APA requires that agency actions be both reasonable and explained. *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021). Neither is the case here.

FDA devoted a substantial portion of its TPL to discussing PMTA marketing plans; a discussion prefaced upon the proposition that it:

> "considers the potential impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and use of tobacco products."[120]

FDA then touted its position that:

> "[m]arketing restrictions include advertising and promotion restrictions intended to limit youth exposure to and appeal of tobacco product marketing (e.g., measures such as limiting advertising to platforms that are predominantly used by adults and using advertising content and methods that are not known to resonate with youth, or even eliminating advertising in certain media channels altogether) and sales access restrictions intended to restrict youth access to tobacco products (*e.g.*, measures such as selling products only in face-to-face interactions, in adult-only facilities, or via websites that require robust age and identify verification)."[121]

FDA repeated the above narrative elsewhere in the TPL.[122] The elements of FDA's position sound a lot like how VDX markets its products.[123] FDA touted the efficacy of these restrictions in its pre-PMTA guidance. In the

---

[120] APPX. 128 (ADMIN. REC. 183).

[121] *IBID.*

[122] APPX. 146 (ADMIN. REC. 201).

[123] Compare FDA Enforcement Guidance, *supra.*, at 22 to APPX. 128, 146 (ADMIN. REC. 183, 201).

immortal words of Yogi Berra, FDA made up its mind but made it both ways.

FDA's TPL, however, disclaimed the efficacy of the very restrictions it touted by claiming that:

> "experience shows that advertising and promotion restrictions and sales access restrictions cannot mitigate the substantial risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit required to demonstrate APPH."[124]

FDA justified this disclaimer by pointing to more than 6,000 warning letters and more than 1,000 civil money penalty complaints issued in 2019 to online and brick-and-mortar retailers.[125] A closer analysis, however, unravels FDA's narrative to a pile a twine.

As a primary point, FDA's TPL offers no factual explanation to support its claimed "experiences" when analyzing the efficacy of marketing plans. FDA, for instance, failed to illuminate whether or not the retailers who received either warning letters or monetary penalties employed the types of disclaimed marketing restrictions (or whether they employed any type of marketing restrictions).

---

[124] APPX. 128 (ADMIN. REC. 183).

[125] APPX. 146 (ADMIN. REC. 201).

No less important is that the 2018 – 2019 temporal period of FDA's observation predated its January 2020 prohibition of flavored closed-system products pending marketing review. Those products were the reason for FDA's 2020 guidance which recognized that flavored closed-system products posed more risks to youths than open-system products.[126] FDA's disclaimer plainly does not apply to flavored open-system products.

Further, FDA failed to either cite any studies or data which supported its disclaimer of its previously touted marketing restrictions or explain specifically why those marketing restrictions were no longer effective in 2024. FDA, after all, has never rescinded its pre-PMTA guidance, and its TPL fails to articulate an explanation which correlates the particular elements of VDX's marketing plan to the elements of the APPH balancing calculation.

FDA's failure leaves many unanswered questions. Did any of FDA's claimed "experiences" relate to age-restricted retail stores? If so, to what extent? FDA neither identifies the efficacy rate of its now repudiated marketing, nor explains how this efficacy rate weighs in the APPH

---

[126] *See* FDA Enforcement Guidance, *supra.*, at 44, 45.

calculation.[127] FDA's TPL based the presumption of ineffectiveness upon the fact that youths "obtain their ENDS products from friends or sources in their social networks."[128] FDA's TPL, however, failed to establish a nexus between such examples of youth access being a function of the failure of elements of a manufacturer's marketing plan. For instance, FDA is holding manufacturers and bricks-and-mortar retailers responsible for circumstances in which youths obtained ENDS products that were either ostensibly purchased in a legal manner or were obtained by youths outside customary retail channels.[129]

In the post-*Loper* world, it no longer cuts the mustard for an agency to say to a court "we are the agency, trust us." FDA has demonstrated no reason for conferring that trust. Given *Loper*, the Court is not obligated to give deference to FDA's disclaimer of the efficacy of the very marketing and sales restrictions which it touted given the existence of numerous unanswered questions arising from its inquiry.

---

[127] Congress's 1992 Synar Amendment to the Alcohol, Drug Abuse and Mental Health Administration Reorganization Act, PUB. L. 102-321, set a 20% maximum failure rate for retail sales of tobacco products to youths.

[128] APPX. 129 (ADMIN. REC. 184).

[129] *See e.g.,* https://www.made-in-china.com/products-search/hot-china-products/Disposable_Vape.html

### iii. FDA's Errors Were Not Harmless

FDA's failure to review VDX's marketing plan was not harmless error. *Wages* sheds new light on the standard applicable in determining the harmless error question *vis-à-vis* FDA's failure to review PMTA marketing plans. *Wages* discussed the tension between the "remand rule" articulated in both *SEC v. Chenery*, 318 U.S. 80 (1943) and *Chenery II*, and the instruction in 5 U.S.C. § 706 to take "due account" of the "prejudicial error" rule applicable in civil cases. 145 S.Ct. at 928, citing *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009). The Court noted that "taking 'due account' of [the prejudicial error] rule is not literally the same as applying [it] lock, stock, and barrel." *Id*.

Instead, the Supreme Court found the "most natural interpretation" of 5 U.S.C. § 706 is that:

> "reviewing courts should adapt the 'rule of prejudicial error' applicable in ordinary civil litigation (also known as the harmless-error rule) to the administrative-law context, which, of course, includes the remand rule."

145 S.Ct., at 928 - 29. *Wages* held this Court misapplied *Calcutt v. FDIC*, 598 U.S. 623 (2023) while FDA had an "excessive" reading of *Sanders*. *Id*. at 44-45. *Wages* pointed to the harmless error standard set forth in *Massachusetts Trustees, supra.*, at 248 (an agency decision is harmless

when "it is clear" the agency's error "had no bearing on the procedure used or the substance of [the] decision reached.").

As shown *supra.*, the TCA mandates that FDA review all evidence included in a PMTA. FDA set an evidentiary which does not reflect reality, especially because the facts upon which it set that bar wholly undercuts its position. If it was error for FDA to not review VDX's marketing plan, ant it then magnified that error in continuing to enforce a presumption bereft of evidentiary support.

## CONCLUSION

This Court should grant VDX's and Vapetastic's Petition for Review and vacate and remand the MDO for further agency proceedings.

Dated: October 16, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

By:   */s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
TROUTMAN LAW OFFICE, PLLC.
   4205 Springhurst Boulevard, Suite 201
   Louisville, Kentucky 40241
   (502) 412-9179
   jgtatty@yahoo.com
   *Attorney for Petitioners*

</div>

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the word limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 12,892 words.

2.     This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, size 14.

                                    */s/ J. Gregory Troutman*
                                    J. GREGORY TROUTMAN
                                        *Attorney for Petitioners*


### CERTIFICATE OF SERVICE

Pursuant to FED. R. APP. P. 15(c), I hereby certify that on October 16, 2025, true and correct copies of the foregoing **Petitioners' Brief** was filed with the Clerk's Office for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

                                    */s/ J. Gregory Troutman*
                                    J. GREGORY TROUTMAN
                                        *Attorney for Petitioners*